UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
PATRICK SHANE                                :
                                             :
                    Plaintiff,               :
                                             :  Case No. 05 CV 2953 (LLS)
        -against-                            :
                                             :  **DECLARATION OF JOEL**
360 GLOBAL WINE COMPANY, f/k/a               :  **SHAPIRO IN SUPPORT OF**
KNIGHTSBRIDGE FINE WINES, INC., JOEL         :  **DEFENDANTS' CROSS-MOTION**
SHAPIRO, MICHAEL L. JEUB, PHILIP E.          :  **FOR SUMMARY JUDGMENT**
PEARCE and LARRY KIRKLAND,                   :  **AND IN OPPOSITION TO**
                                             :  **PLAINTIFF'S MOTION FOR**
                    Defendants.              :  **PARTIAL SUMMARY JUDGMENT**
                                             :
----------------------------------x

I, JOEL SHAPIRO, declare that:

1.      I am the CEO of defendant 360 Global Wine Company f/k/a Knightsbridge Fine Wines, Inc. ("Knightsbridge"), and an individually-named defendant in this action. I submit this Declaration in support of the Cross-Motion for Summary Judgment ("Cross-Motion") of defendants Knightsbridge, Joel Shapiro, Michael L. Jeub, Philip E. Pearce and Larry Kirkland (collectively, "Defendants") and in opposition to Plaintiff's Motion for Partial Summary Judgment ("Motion").

2.      For the reasons set forth below and in Knightsbridge's accompanying Memorandum of Law, Plaintiff's claims for breach of contract and breach of fiduciary duty ("Claims") should be dismissed on this Cross-Motion, and Plaintiff's Motion should be denied.[1]

3.      The nub of plaintiff Patrick Shane's Claims is that Knightsbridge wrongfully cancelled Mr. Shane's Knightsbridge stock certificate because, allegedly, the shares

---

[1] The parties have stipulated to the voluntary dismissal of Plaintiff's second cause of action for "Conversion." (*See* Stipulation of Voluntary Dismissal, dated December 14, 2006, attached hereto as Exhibit 1.)

"were fully paid for" by Mr. Shane. (*See* Complaint ¶¶ 48, 46- 50, attached as Exhibit A to Wolkenstein Affirmation in Support of Motion for Summary Judgment, dated November 13, 2006 ("Wolkenstein Affirmation"), and incorporated by reference herein.)

4. Plaintiff's Claims must fail for a very simple reason: <u>Mr. Shane, by his own admission, never paid the Purchase Price for the shares of stock at issue in this case</u>. (*See* Deposition Transcript of Patrick Shane, dated September 19, 2006, attached hereto as Exhibit 2, at 59 - 60.) Due to Mr. Shane's breach of the Subscription Agreement, which required that he pay for his shares, the Board of Directors of Knightsbridge sought to cancel his shares. In light of Mr. Shane's admission in his deposition testimony that he never paid for the shares, and the clear and unequivocal language in the Subscription Agreement requiring such payment, Mr. Shane's breach of contract and breach of fiduciary duty Claims are wholly without merit.

**Background**

5. Knightsbridge Fine Wines ("Knightsbridge I"), a privately held corporation, was incorporated on or about October 8, 2002, in the State of Nevada. I was the sole founder of Knightsbridge I.

6. Plaintiff Pat Shane and I were the two original directors of Knightsbridge I.

7. Prior to the founding of Knightsbridge I, in or about 2000, I solely founded and owned JS Capital, a financial consulting company formed under the laws of Delaware and wholly separate from Knightsbridge I or Knightsbridge II (as defined below; Knightsbridge I and Knightsbridge II are collectively referred to herein as "Knightsbridge"). JS Capital was in the business of consulting and assisting private and public companies seeking

financing. JS Capital earned revenue by receiving commissions from clients only when transactions that JS Capital consulted on were successfully consummated.

8. In or about 2001, Mr. Shane, with whom I was previously acquainted through my prior involvement in the investment business, contacted me about the possibility of our working together on potential transactions. He represented to me that he had a strong background in the field of investment consulting and was an expert in the field of raising investment capital. In reliance on his representations, I agreed to work with him on a case-by-case basis, in connection with various potential consulting engagements on behalf of JS Capital. The terms of our working relationship varied depending on the specifics of each projected engagement. In general, we orally agreed that each of us would equally contribute our time and best efforts and any funds necessary to pursue such engagements, and that net profits, if any, from any transactions that were consummated would be divided equally (or, in the case where our contributions were not equal, then we each would receive our pro rata share of any net profits).

9. During the time that he was involved with JS Capital, Mr. Shane contributed his time and financial resources to various potential transactions. For example, on or about June 28, 2002, several months before Knightsbridge I was formed, he wired $5,000 to my personal bank account. He sent me this money to pay his share of the legal costs incurred with respect to a potential transaction that we were pursuing with Gemini Investments on behalf of JS Capital. Similarly, on or about December 9, 2002, Mr. Shane wired $2,000 to my personal back account to pay his share of travel costs related to JS Capital. I used these monies for their intended purposes. Both of these events occurred many months before Mr. Shane received and

C053475/0198937/1354494.3

signed the Subscription Agreement. (Copies of the wire transfer advice for both transfers are attached hereto as Exhibit 3a)

**The Formation of Knightsbridge I**

10. I first formed Knightsbridge I in late 2002, although it did not become an operating business until many months later. Initially, Knightsbridge I was solely an investment vehicle for the building of an international wine company. The business plan was to raise capital in order to purchase various wineries throughout the world and to bring them under the management of a single corporate entity. The goal was to take the company public within a year's time.

11. Mr. Shane was involved in my early discussions concerning Knighstbridge I. He repeatedly promised me that he would contribute his best efforts toward developing Knightsbridge, including among other things, raising capital, finding acquisition targets, performing research analysis and bringing in retail after-market stock support.

12. In reliance on his promises, I told Mr. Shane that at the time that Knightsbridge went public he would have the opportunity to purchase a large block of Knightsbridge shares at a deeply discounted price.

13. In or about July 2003, Knightsbridge I sent to Mr. Shane the Subscription Agreement. (The Subscription Agreement is attached hereto as Exhibit 3.) The execution of the Subscription Agreement by Mr. Shane and the subsequent issuance of shares to Mr. Shane was

4

undertaken in anticipation of and to effectuate Knightsbridge I's going public (as more fully described below).[2]

14.  The Subscription Agreement sent to Mr. Shane offered him "1,200,000 shares of the Company's common stock . . . at a price of 0.001 per share (the "Purchase Price")", or $1,200. Contemporaneous with the sending of the Subscription Agreement to him, I informed Mr. Shane orally that he would have to purchase the 1.2 million shares for $1,200, as set forth in the Subscription Agreement.

15.  On or about July 7, 2003, Mr. Shane executed the Subscription Agreement with respect to the purchase of 1,200,000 shares of Knightsbridge I stock, and subsequently returned it to Knightsbridge I. Pursuant to the Subscription Agreement, the Purchase Price of his stock was $1,200. Knightsbridge performed its obligations under the Subscription Agreement when it sent to Mr. Shane certificate number C-5, representing 1,200,000 shares of Knightsbridge I stock. (A copy of the stock certificate is attached hereto as Exhibit 4.)

16.  Despite the fact that he received the share certificate, Mr. Shane refused to pay the $1,200 Purchase Price as required under the Subscription Agreement. At his deposition in this case, which I attended, he admitted that he never paid the Purchase Price for the stock. (*See* Exhibit 2 at 59 - 60.) Mr. Shane also admitted that the $7,000 in wire transfers that he sent to me in June and December 2002 were not for Knightsbridge, as alleged in the Complaint (*see* ¶ 22), but, rather, were payments to JS Capital. (*See* Exhibit 2 at 16.)

17.  The requirement to pay the Purchase Price was never waived by or on behalf of Knightsbridge.

---

[2]  At about the same time that Mr. Shane received the Subscription Agreement, other original subscribers were also given the opportunity the purchase shares of Knightsbridge I stock and received subscription agreements.

18.     The Subscription Agreement is the sole agreement concerning Knightsbridge I stock entered into between Mr. Shane and Knightsbridge I. Further, there are no agreements concerning Knightsbridge I or Knightsbridge II stock entered into between Mr. Shane and myself.

19.     Further, the opportunity to purchase Knightsbridge I shares was provided to Mr. Shane contingent on his repeated promises that he would provide monetary and non-monetary contributions to Knightsbridge I. However, just as he failed to pay the Purchase Price, he also failed to live up to his commitment to provide services to the Company.

## Knightsbridge Goes Public

20.     Soon after Mr. Shane executed the Subscription Agreement, Knightsbridge I entered into a Share Exchange Agreement as of July 31, 2003, with Tech-Net Communications, Inc. ("Tech-Net"), a publicly traded Nevada corporation. This transaction was completed on or about August 1, 2003. By virtue of the completion of that transaction, persons or entities who properly held shares of Knightsbridge I stock were issued shares of Tech-Net stock ("Tech-Net Stock").

21.     The transactions contemplated by the Share Exchange Agreement resulted in Knightsbridge I becoming a wholly-owned subsidiary of Tech-Net. This transaction was completed on or about August 1, 2003.

22.     On August 1, 2003, Tech-Net filed an 8-K report with the Securities and Exchange Commission, in which it reported the change in control of Tech-Net to the shareholders of Knightsbridge I, and advised the SEC that the officers and a minority of the directors of Knightsbridge I had become the sole officers and directors of Tech-Net. Tech-Net filed a copy of the Share Exchange Agreement as an exhibit to the form 8-K which was

incorporated in its entirety into the 8-K. (A copy of that Exhibit is attached as Exhibit F to the Wolkenstein Affirmation and is incorporated by reference herein.)

23. On or about September 10, 2003, Tech-Net changed its name to Knightsbridge Fine Wines ("Knightsbridge II").

24. After the consummation of the merger, in exchange for his Knightsbridge I shares, Mr. Shane received Tech Net stock certificate number 223, purportedly representing 600,000 shares of Tech-Net Stock and certificate number 267 purportedly representing an additional 600,000 shares of Tech-Net Stock. (Copies of these certificates are attached hereto as Exhibit 5.)

## Shane Fails to Pay the Purchase Price and Knightsbridge Takes Action to Cancel His Shares

25. In or about July 2004, the Board of Directors of Knightsbridge II (composed of myself, Anthony J.A. Bryan, Phillip E. Pearce and Larry Kirkland)[3], along with the Company's legal counsel, held a telephonic meeting, and learned that ten individuals, including Mr. Shane, had not paid for their stock under their respective subscription agreements and/or had failed to provide service(s) to the Company in breach of their promises to the Company. It was our understanding that these ten individuals were the only subscribers who had failed to pay consideration for their stock.

26. Upon counsel's advice and acting in a good faith belief that its conduct was in Knightsbridge II's best interests, while exercising due care to ascertain the relevant facts

---

[3] Anthony J.A. Bryan has also served on the Board of Directors of Federal Express Corporation, Chrysler Corporation (now, DaimlerChrysler Corporation), and The PNC Financial Services Group, Inc; Phillip E. Pearce is former chairman of the NASD; and Larry Kirkland is the owner of Kirkland Ranch Winery.

7

before acting, the Board passed a resolution, dated July 7, 2004 ("Resolution"), resolving that "for lack of payment and service to the Company, the Company hereby instructs Pacific Stock Transfer to cancel 1,200,000 shares in the name of Pat Shane." Similarly, the Board also passed resolutions with respect to the cancellation of stock held in the name of nine other shareholders "for lack of payment and service to the Company." (A copy of the Resolution is attached hereto as Exhibit 6.)

27. The only reason why the Knightsbridge II Board of Directors resolved to cancel Mr. Shane's stock was because he was in breach of the Subscription Agreement by keeping possession of the stock certificates even though he has failed and refused to pay the Purchase Price. Mr. Shane's accusations that the cancellation of his shares was animated by selfish or improper motives is a total fabrication.

28. On July 16, 2004, I sent a letter to Mr. Shane on behalf of Knightsbridge II, in my capacity as Chairman and Chief Executive Officer, entitled "notice of the cancellation of shares of [the] common stock" (the "July 16 Letter"). (A copy of the July 16 Letter is attached hereto as Exhibit 7.) Among other things, the July 16 Letter states that "[s]ince you have not paid the purchase price and have not provided any of the services you have agreed to provide the Company as consideration for your shares, the Company is rejecting your subscription and canceling your stock certificate." Pursuant to the Resolution, similar form letters were sent to the nine other individuals who were also in default. (These letters are attached hereto as Exhibit 8.)

29. The July 16 Letter sent by Knightsbridge II to Mr. Shane put him on notice that: (a) the requisite payment pursuant to the terms of the Subscription Agreement had not been made, and (b) he had the opportunity to provide proof of payment or tender such

8

payment to Knightsbridge II. Since I told him orally that he had to pay for the stock when he originally received the Subscription Agreement, he was well aware of his obligation to pay the Purchase Price. Indeed, Knightsbridge had given Mr. Shane over a year to pay the Purchase Price before it sent the July 16 letter to him. Yet, he refused to do so.

30. After receiving the July 16 Letter, Mr. Shane failed to submit proof that he had paid the Purchase Price, and did not offer to pay, or tender the monies that were due and owing for the stock.

31. Despite my request that he return the unpaid stock certificates, he also refused to do this. To this day, he wrongfully holds them in his possession -- even through he has never paid consideration for them. As a result of his retention of the stock certificates, the transfer agent has not been able to cancel the shares, and the shares remain outstanding. Indeed, according to the transfer agent's records, Mr. Shane continues to own these shares. *(See* Letter from Jodi Godfrey of the Pacific Stock Transfer Company to Joel Shapiro, dated September 14, 2006, attached hereto as Exhibit 9.)

**Conclusion**

For the reasons set forth above, and for those set forth in Defendants' Memorandum of Law, this Court should (a) grant Defendants' Cross-Motion for Summary Judgment and (b) deny Plaintiff's Motion for Partial Summary Judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 18, 2006
Fairfield, Connecticut

_____
Joel Shapiro